RENDERED: DECEMBER 16, 2022; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NOS. 2020-CA-0814-MR AND 2020-CA-0955-MR

RHONDA LAWSON                                                                                          APPELLANT

v.
APPEAL FROM FAYETTE FAMILY COURT
HONORABLE KATHY W. STEIN, JUDGE
ACTION NO. 18-CI-01401

MARK KLEINMAN                                                                                          APPELLEE

OPINION
AFFIRMING

** ** ** ** **

BEFORE: CALDWELL, McNEILL, AND TAYLOR, JUDGES.

McNEILL, JUDGE: Rhonda Lawson contests three separate adjudications of the

Fayette Family Court relating to the custody of her minor son, K.E.L. First, she

argues the family court erred in granting sole custody of K.E.L. to appellee Mark

Kleinman, the child's father. Second, she argues the family court abused its

discretion by denying various requests she made to require Kleinman to pay her

attorney's fees over the course of the underlying litigation.  Third, she argues the family court lacked jurisdiction to subsequently restrict her from communicating certain details about K.E.L. on social media.  Upon review, we affirm.

## I. ORDER OF SOLE CUSTODY

We begin with Lawson's first argument.  In granting sole custody of K.E.L. to Kleinman and four days of visitation per month to Lawson,[1] the family court determined Lawson was unable to effectively function as a co-parent with Kleinman due to her animosity toward Kleinman and Kleinman's wife; and that Lawson's conduct over the years prior to and during this litigation demonstrated "an absence of mature judgment which is required for the best interests of [K.E.L.]"  With that said, Lawson contends the family court founded the bases of its custody decision upon irrelevant facts and innuendo, rather than substantial evidence.  Accordingly, it is necessary to review the lengthy history of this case, as well as the family court's assessment of the large volume of evidence underpinning its decision.  To that end, we turn to the family court's December 30, 2019 custody order and quote it as follows:

> On October 30th, 2017, Respondent Rhonda
> Lawson, (hereinafter Lawson) gave birth to the child
> K.E.L., (hereinafter child).  Dr. Mark Kleinman, the
> Petitioner (hereinafter Kleinman) acknowledged
> paternity of the child based upon the sexual relationship

---

[1] The family court's December 30, 2019 order initially omitted, but was later amended to include, the scope of Lawson's visitation rights.

he had begun with Lawson in August 2014 when he had searched Craig's List for a massage therapist and began massages with Lawson. The relationship between masseuse and client soon became sexual, as acknowledged by both parties, and ultimately lead [sic] to the filing of two actions by Kleinman.

The first action was an Emergency Protective Order requesting a Domestic Violence Order (hereinafter DVO.) The hearing in 18-D-00428-001 lasted for 18 hours over a period of three days – May 10th, May 25th, and June 6th, 2018. The findings in that hearing resulted in a DVO prohibiting Rhonda Lawson from having any contact with Mark Kleinman, his wife, Blythe Savage, and their two minor children for the maximum period allowed statutorily, [two[2]] years. For this custody action, it was stipulated by the parties that the evidence in the DVO is admitted as evidence in this case.

The second action is this custody action. Lawson also filed an action for custody and child support, 18-CI-1426, which has been consolidated with this case.

Testimony for custody of the child in this case required testimony and evidence initially scheduled for three days – May 22nd, June 4th, June 11th, 2019. While the Court was reviewing the voluminous evidence presented from those three dates, when both parties had announced the close of their cases, further motions affecting the case and presenting additional evidence were heard on October 2nd and October 25th, 2019. Lawson filed a motion requesting changing the exchange location and Kleinman filed a motion to reopen proof in the case. Evidence presented in each of the hearings on these motions will be discussed later herein.

---

[2] The family court mistakenly indicated in its December 30, 2019 order that the duration of the DVO was for three years. It later corrected the error through a subsequent order.

-3-

During his case in chief, Kleinman testified and called two other witnesses, a private investigator, and Davina Warner, LCSW [licensed clinical social worker], who serves as the Friend of the Court (hereinafter FOC) for the Fayette family court divisions. He introduced certified records concerning both his physical and mental health, and his income information for child support calculation.

Lawson testified and called the child's pediatrician, an LCSW who provided a mental health assessment and two witnesses to testify to her character, one of whom testified regarding phone conversations between Kleinman and Lawson she said she had listened to with Lawson's permission.

At the time Kleinman and Lawson met and began their sexual relationship, he was an eye surgeon employed by the University of Kentucky. He was married to Blythe Savage and had an 11-year-old daughter and a 13-year-old son. At the time of this litigation, Kleinman and his family had moved to Bristol, Tennessee, a move that figured prominently in [the] actions leading to the issue of the DVO and this custody action.

Lawson was a single mother of three children by two fathers to whom she had not previously been married. Her income consisted of the money she made from her profession as a sensual masseuse and child support she received from the father of her two eldest children.

She and the children lived a comfortable lifestyle in a middle-class neighborhood where all three of her children attended school regularly, were involved in extracurricular activities, and did very well in their studies. Lawson's parents lived in Morristown, Tennessee and her mother was often a visitor in her home with a close relationship to all three of her grandchildren.

Kleinman's University of Kentucky employment as an eye surgeon included research and the pursuit of grants to fund that research. His work hours were long, irregular and variable. His curriculum vitae was lengthy and impressive. Evidence showed that the time Kleinman spent with Lawson was limited by his onerous schedule of surgeries, clinic coverage, charting, grant-writing and time spent with his wife and two children. Entering the third of the four years of his relationship with Lawson, Kleinman had become very dissatisfied with his employment at the University of Kentucky and had determined to find employment in private practice that would not require as many hours on duty but would pay him the salary his experience and expertise deserved. His departure from employment at the University of Kentucky required an agreement that he would not practice within 100 miles of Lexington.

Evidence presented in the hearing resulting in the DVO revealed that the money Lawson earned by providing sensual massages were [sic] accompanied by sexual acts and chiefly occurred at her home. Her activity with Kleinman began in August 2014 and continued in that manner until May 2017, when Lawson announced to Kleinman that she was pregnant, but their mutual testimony affirmed that sexual relations between them finally ceased at the end of May 2018 when their child was seven months old and the actions leading to the issuance of the Emergency Protective Order occurred.

Evidence also was produced during the DVO hearing of Lawson's criminal history. During the custody hearing she stated that her criminal record was not relevant because the guilty pleas had occurred prior to Kleinman's child's birth.

Lawson's request to ignore consideration of her criminal history was made during an interview with the FOC who determined that the criminal acts and

convictions happened while her eldest three children were young, not yet attending school.

Certified exhibits showed the record of guilty pleas to three shoplifting charges and a guilty plea to a Lexington Fayette County [sic] Urban County Government ordinance of having no business license for her business she described as an escort service. Her description of this criminal history to the Friend of the Court, and to David Waters for her mental health assessment, showed significant dishonesty regarding the disturbing nature of the actions for which she was charged and to which she pled guilty.

Lawson admitted to two shoplifting charges and violation of a city ordinance. She was represented by counsel for all the guilty pleas she entered.

However, exhibits entered during the hearing showed a total of three, not two, shoplifting charges. The first one, on January 11, 2009 was a felony charge from a department store. Her guilty plea, to a plea-bargained misdemeanor, was a confession to theft totaling $674.12 so she could pay her babysitters who had requested that manner of payment. This is the one she admitted to the FOC while describing it as a good learning experience.

However, that theft conviction was followed by two more charges and convictions five years later. On August 18, 2014 she was charged with concealing merchandise valued at $277 in her purse and exiting a department store without payment, and on November 6, 2014 she was charged at another department store for the theft of $138.42 in merchandise. Lawson pled guilty to both charges. One of these convictions occurred closely in time to the beginning of her relationship with Kleinman, and the second occurred after the relationship had begun.

The most troubling criminal conviction is a fourth guilty plea that Lawson seeks to diminish. On February 5, 2013 a law enforcement officer appeared at her home. The result of the charge made on that date was a guilty plea to a local ordinance of having no business license. Evidence of the entirety of that guilty plea was offered in the DVO hearing, wherein Lawson pled guilty to a citation stating she was contacted by text from the law enforcement officer who saw her name on a social website, Back Page, where she offered naked massages for $80. When he appeared at her door, Lawson stated she massaged naked males while they masturbated, and she played with their testicles. Her guilty plea to having no business license for what she termed an escort service resulted in a fine of $100. Further testimony from the DVO hearing related to the fee she charged for a massage noted the fee per massage had risen to $100 by the time Kleinman became a client.

In her description of the relationship with Kleinman, Lawson provided as evidence copies of text messages, beginning in May 2017, and many pages of what she presented as transcripts she had made of the hundreds of calls between them, which revealed a relationship that was very familiar, replete with graphic references to the sex acts they shared. The phone calls and texts revealed that Kleinman was unable to join Lawson as often as she wished. Their time spent together was at the home she shared with her three children who were then elementary and middle school aged.

Lawson stated she was unaware of Kleinman's marital status until she announced her pregnancy in May 2017, but evidence heard throughout the case strained credulity to believe that for the two and a half years she regularly massaged and spent time with Kleinman prior to the pregnancy she did not know he was married. The length of time the two were intimate before the pregnancy, limited to Lawson's home, calls into question

Lawson's credibility that she believed he was a single man.

Upon announcing to Kleinman she was pregnant, her description of their initial discussions regarding the future of the pregnancy is conflicting. Lawson advised Kleinman she had not planned on having a fourth child but neither did she wish to terminate the pregnancy. Lawson herself produced as evidence a lengthy May 10, 2017 email to her, wherein Kleinman stated the decision regarding the pregnancy was hers alone to make. In that email he stated the two options available to them: termination of the pregnancy or carrying the pregnancy to term. He clearly stated he wanted a relationship with the child if her decision was to carry the pregnancy to term.

If her decision was to terminate the pregnancy, Kleinman asked that there be an agreement between the two without involvement of legal counsel, but with a notarized statement that the termination was a mutual decision.

He made no offer of financial payment for her to terminate the pregnancy. He did ask her to understand and respect his situation with the substantial risk he would take if the pregnancy went to term because of his determination to support the child and develop a relationship as its father. He told her he did not want to risk his marriage and the loss of his children if the illegitimate birth became known publicly, but it was a risk he was willing to take to have a relationship, albeit secretly, with his child.

The specific amount of $2000 a month was suggested as an amount he would be able to pay Lawson for at least two years without his wife becoming suspicious of the family finances. He stated he had already begun establishing an account for the transfer of that amount at his current salary at the University of

Kentucky, with the monthly amount to increase as his income did.

In the same email, following his description of the two options, Kleinman mentioned a "spin" of two more ideas. The child could be described as a surrogate for his family based upon his wife's age and inability to have another child, or else described as Lawson's wish for another child whose help and support Kleinman would provide. There was no mention of a sum of money tied to either of those ideas. He affirmatively stated in the email that if she would like to seek out a family attorney to "find an agreement" he agreed to do so.

Kleinman ended the May 10, 2017 email message with his request for Lawson to share with him her thoughts regarding his suggestions.

There were no direct responses in reply to Kleinman from Lawson until months later, on March 27, 2018, when she presented what she proposed as an agreement between the two for co-parenting the child beginning on that very date. The proposed agreement called for payment of $4000 per month for child support continuing through June 2020, and then increasing to $6000 per month, with Kleinman also responsible for payment of the costs of the child's postsecondary education.

Lawson's pregnancy was significantly troubled by her poor oral health existing at the time which required numerous dental visits, and Urgent Treatment Center and emergency room visits. She required several prescribed medications to treat infection and the pain accompanying the oral disease. The record includes page after page of texts between Lawson and Kleinman of Lawson stating extreme, excruciating pain preventing her from either rest or sleep. Kleinman answered Lawson's messages with his medical training and gave her suggestions for relief.

-9-

His responses to her descriptions of agony were sympathetic.

At that time Lawson's mother appeared to have moved in with her daughter and grandchildren and was assistance to Lawson with her three children during the pregnancy. Although her mother lived with Rhonda's father, on a farm in Morristown, Tennessee, a short distance from Kleinman's Bristol address, at times it appeared that Rhonda's mother lived with her daughter and three grandchildren full time in Lexington.

As noted, Lawson had a very difficult and unpleasant first trimester of pregnancy. The problems abated for a period but resumed at the third trimester. Lawson sent numerous, lengthy text messages to Kleinman describing her recurrent dental problems. Lawson at times was inconsolable in her complaints to Kleinman, asking his medical advice. Kleinman's responses remained sympathetic as he responded to Lawson's hundreds and hundreds of texts and phone calls occurring for days on end.

Kleinman was present for parts of the labor and 5-week early delivery of their son who was born at the University of Kentucky hospital where Kleinman practiced surgery. When Lawson and the baby were released to her home after 7 days, texts and phone messages reflect the eagerness both parents had for the baby and father to bond with each other.

However, Lawson shortly began to complain to Kleinman how very hard it was to care for the child who she said slept only for short periods of time, preventing her to have time she needed to recover from the cesarean delivery. Kleinman's schedule did not allow the time she requested him to join her in caring for the baby. She complained significantly and constantly to Kleinman of the post-partum depression she was experiencing.

-10-

Lawson's mother, again, was present with her daughter, the infant and her other grandchildren during this time.

Breastfeeding proved difficult for mother and child because of the post-partum depression. Lawson said the child required feeding every two hours, making it difficult for her to recover from her fourth cesarean operation, allowing her only two or three hours of sleep at a time.

Kleinman's financial support of his son had begun prior to the child's birth, in her sixth month of pregnancy. The evidence was presented by his testimony, documents proving his annual income, copies of his checks to her, and monthly statements from the American Express credit card designated for her use.

An American Express card credit amount of $2000 per month was established for Lawson beginning on August 14, 2017 and was accompanied by a cash payment of $2000 each month. The expenditures from the American Express card continually showed large expenses that could not be attributed to expense for the baby or the upkeep of the household. Within the first 14 days of the American Express credit availability, when Lawson was in the second trimester of pregnancy, $225 was spent at beauty supply stores and well over $300 was spent at a sporting goods store.

For the first full month that $2000 was provided as credit by the American Express card, an average of over $60 a day for 14 days was spent at fast food and coffee establishments, and over $400 was spent for youth entertainment. The child was not born until two months later.

Following the child's birth on October 30, 2017, he and Lawson were discharged from the hospital 7 days later. Charges totaling over $800 were made on the American Express card to fast food establishments,

movie theatres, skating rinks, restaurants and department stores while Lawson was hospitalized with the child.

Kleinman also presented evidence of checks written to Lawson between August 2017 and March 2018 totaling $17,300, in addition to the credit afforded Lawson on the American Express card. The evidence showed Kleinman paid or provided to Lawson a total of $35,300 for the 9 months she required the payment of $4000 per month. She demanded that amount to rise to $6,000 beginning in July 2020.

In January 2019, following the Friend of the Court report, a schedule of timesharing of alternating week-long visits with the parties began. Occasional overnight visitation with Kleinman in Lexington had already begun after several visits of 4 to 6 hours at a time when Kleinman was joined by his wife and children. The FOC observed the visits and provided the court detailed favorable descriptions of the Kleinman family's time spent with the child.

The existence of the DVO, as stated previously, required an exchange location staffed with personnel knowledgeable of domestic violence and child development. Kleinman located such a place roughly halfway between the homes of the parties, at Parent's Place, in Knoxville, Tennessee, which was then designated as the place where the child would be exchanged each Saturday morning, with a set time structure so that the parents would not be within sight or sound of each other during the exchange. Kleinman testified his drive from Bristol to Parent's Place was approximately 2 hours in length. He believed Lawson's drives were 15 to 30 minutes longer than his. Weekly reports were compiled by Parent's Place and entered into evidence. These reports were referenced again in the subsequent hearings in October 2019, when Lawson requested a change in the location for the exchange. She had brought many complaints about the service

provide[d] by Parent's Place, which had reported a violation of the DVO by Lawson's pulling her car up next to Kleinman's in the parking lot, early in the beginning of the exchanges. She accused the personnel of Parent's Place of being partial to and biased in favor of Kleinman. She subtly suggested that Kleinman was paying the personnel to give favorable reports on his behalf, just as she had accused the FOC of being paid to recommend in her report to the court that Kleinman receive sole custody of his son.

Kleinman described his early weeks with his child in detail. He spoke of the child's demeanor, his physical health, his eating and sleeping habits and his reaction to his siblings and his wife. After the anxiety the child expressed from separation from his mother to the Parent's Place personnel, he said the child cried for short periods of time until Kleinman took him to the gymnasium located there where the child's attention was quickly directed toward the balls present there for play. He stated the child travelled well in Kleinman's car to his home in Bristol.

Kleinman described that the structured life with his family allowed the child to "blossom" as the weekly visits continued. Kleinman was concerned at the beginning of the visits that the child was not walking, but he soon began walking and running.

The child's routine was a schedule with a regular wake up time, breakfast, activities and a morning nap, lunch, followed with learning activities, an afternoon nap, a snack, playtime and then dinner with the family. His bath and bedtime were on a regular schedule. He was read to each night. He slept well throughout the night in his own room. He showed musical ability and is fascinated with balls of all sizes.

Kleinman's two children of his marriage were delighted to have their sibling with them and were

described as having come to love him, as had Kleinman's wife.

Regarding the child's health care, Kleinman was very concerned about Lawson's failure to provide the routine childhood vaccinations that are universally recommended by pediatricians. She explained that she had become concerned about the rumors about side effects from the shots, and even though the child's pediatrician had told her it was safer to immunize the child than to forgo the shots, she had decided not to have the child immunized. Kleinman brought the child current with the immunizations. He learned from the Tennessee pediatrician he had chosen for the child that there was evidence of frequent ear infections of which he had not been advised by the mother.

Kleinman expressed concerns regarding a safe and stable environment for his son. He hired a private investigator to see if Lawson was giving sensual massage in the home, but the investigator saw two men going in or out, which relieved him. However, the disturbing criminal history he had come to learn of in Lawson's recent past, coupled with evidence of her appearance advertising such services on media sites under the name of "Carrie Jo," he believes she has resumed her former profession. The Court shares his views and notes the evidence showed she previously conducted her business at her home prior to her children being school aged.

When questioned why there cannot be co-parenting with Lawson, he stated he believes Lawson to be treacherous with a history of risky behaviors. The existence of the Domestic Violence Order for no contact speaks for itself on that issue. Kleinman testified his work schedule allows significant time for him to be home with his family for the child to live in a stable and nurturing household.

-14-

The reports provided by the FOC resulted in a thorough investigation revealing evidence of absolute relevance to this child's custody. The information provided in that examination of the circumstances of the families, and the reports from Parent's Place are evidence the court must use to determine the best interest of this child.

KRS[3] 403.270 controls the evidence to be used in awarding child custody and requires specific findings on each of the relevant factors to determine the best interests of the child. This court must give equal consideration to each of his parents.

The relevant factors required to be considered by the court are the wishes of the child's parent or parents, the wishes of the child, the interaction and interrelationships of the child with parents, his siblings and any other person who may significantly affect the child's best interests, his adjustment to home, school and community, and, the mental and physical health of all individuals involved.

The first factor considered in this case is replete with evidence that both parents love this child completely, and nothing has been made clearer than the desire Lawson has to retain the custody of her son. Although the pregnancy, delivery and first few months of her experience with her son were very difficult, as many are, it is clear she loves him very much and desires to keep him in her custody. However, his father has shown an incredible determination, expending amazing effort, time and resources to establish a very loving relationship with a baby whose very existence should have turned his life with his family completely upside down. His resolve to make this child an integral part of his family is remarkable. He had to prove first to his wife and his children that his need to preserve their familial bond

---

[3] Kentucky Revised Statute.

-15-

through his love for them, once shown as faltering because of his infidelity, is no longer able to be broken. Because of his proven ability to do that, this child has become an integral part of the family that welcomes him with a love that defines what it is to be a member of a family.

When considering the factor of the wishes of the child of this age and in this circumstance regarding his custody, the chief evidence that is relevant and able to be measured is how he has reacted during the period of revolving weeks between the families with whom he has spent that time.

The evidence clearly shows he is thriving in the structured life he enjoys in Tennessee with his Kleinman family.

The factor regarding the interaction and relationship the child has with each of his parents can also be determined by examining how the parents show their desire for custody of the child in their day to day presence with him. Proof presented in this case shows the child is equally comfortable in the presence of both his mother and his father.

Evidence of the child's relationship with his siblings shows his ease and comfort with both sets of them, although it is concerning that the FOC report points to the Lawson siblings' hyper-attentiveness to the child, evidencing traits of their parentification, an unhealthy trait in any family.

Kleinman's wife is clearly a very positive and significant influence on the child's well-being. Evidence presented shows she has welcomed the child as her own, on an equal basis with her other two.

The deciding factor in this case is found in the evidence shown regarding the mental health of the

individuals involved, in this case, the mental health of Lawson.

While Kleinman presented evidence showing he finally recognized the danger to his health he risked by his entanglement with Lawson, presenting certified records of the mental health counseling he sought and is continuing in Tennessee, Lawson has resisted having a complete mental health assessment. Granted, she did not become aware of the deficiency of the David Waters assessment until the June hearing. Kleinman's marital counseling with his wife seems to have been transformational and appears to have strengthened the bond he shares with her. The evidence produced regarding the entirety of the relationship resulting in this child whose best interests require determining, revealed such waves of hostility directed toward Kleinman's wife that her strength of character in refusing to be distracted from the goal, can only be described as mythical. Kleinman showed good judgment by seeking counseling to continue his relationship with his wife.

Evidence replete throughout this case, including evidence from the DVO and the two hearings from October motions, combine to show a very unfortunate obsessiveness Lawson developed early in her relationship with Kleinman and his family and which unfortunately has not diminished over time. Indeed, there is evidence the obsession is growing.

Lawson's motion requesting a change of the exchange location, heard in October 2019, revealed that Parent's Place had cancelled the ability to use their facility because of the excessive complaints she had filed, alleging that the personnel there were partial to Kleinman and their subsequent inability to interact professionally with her.

Kleinman's motion requesting to reopen the proof in the case was also heard in October and allowed entry

-17-

of certified records from the Tennessee Department of Children's Services, showing numerous reports to the agency alleging abuse of the child while he was with the Kleinman family. All the reports were unsubstantiated. Lawson had also contacted law enforcement at the Bristol, Tennessee Police Department, for an unknown number of times, alleging abuse of the child by someone in the Kleinman family. Law enforcement contacted in Tennessee brought no charges.

The continual allegations made against the Kleinman family reveal Lawson is unable to disregard her jealousy of Kleinman's wife. Her initial jealousy has grown into an unhealthy, pathological dislike for the woman who is married to a man who presented himself to Lawson as a massage client. Lawson's pro se pleadings and her testimony constantly use the terms: "rip" "revenge" "scorned wife" and "marriage repair tool" as her description of the reason the Domestic Violence Order and this custody action were filed.

It is also disturbing that the evidence is clear Lawson was significantly motivated by the monetary windfall this child would afford her whole family. Although she has denied she used her son to gain money, it is difficult to ignore she had arranged to receive a tax free annual sum of $48,000 through June, 2020 followed by the annual sum of $72,000 thereafter.

Lawson's inability to place her full attention on her son's wellbeing, and instead seeking monetary gain and revenge on the ones by whom she feels wronged, shows an absence of mature judgment which is required for the best interests of this child. Sole custody is granted to Mark Kleinman.

Thereafter, Lawson moved to alter, amend, or vacate the family

court's order. Regarding the issue of K.E.L.'s custody, Lawson raised the same

arguments she now raises on appeal. She pointed out that the family court made no determination that she qualified as an "unfit parent." For purposes of this case, however, it was unnecessary to determine whether Lawson was an "unfit parent." In deciding which parent should have custody, KRS 403.270(2) provides that a court shall determine custody in accordance with the best interests of the child and equal consideration shall be given to each parent. That is the standard the family court followed below. A parent's "fitness" is relevant when a nonparent who does not meet the statutory standard of *de facto* custodian in KRS 403.270 seeks custody. *See Glodo v. Evans*, 474 S.W.3d 550, 553 (Ky. App. 2015).

Lawson also faulted the family court for giving little weight in its findings to her evidence. Regarding the family court's finding that she "was significantly motivated by the monetary windfall this child would afford her whole family[,]" Lawson emphasized her testimony that $4,000 or $6,000 per month in child support was, in her view, a fair and equitable amount; and that she had only used Kleinman's American Express card for purchases unrelated to K.E.L. to reimburse herself for other purchases she had made for K.E.L. using her own funds. She also emphasized her testimony that she had never attempted to use

K.E.L. to extort money from Kleinman; and that Kleinman had, in actuality, attempted to bribe her to either abort K.E.L. or sell him the child.[4]

Apart from that, Lawson asserted Kleinman was dishonest about his intentions toward herself and her family. She asserted her numerous complaints to authorities that K.E.L. was being abused while in Kleinman's care were founded upon "legitimate concerns."[5] She asserted her criminal record and ordinance violation should not have been considered. She noted that while there were, at the time of trial, advertisements for sensual massages on the internet bearing her likeness and telephone number, she had specifically testified they were not her advertisements. She noted that if she was characterized as a sex worker, it reflected just as poorly on Kleinman. She also argued much of the conflict in this custody dispute had been caused by the strain of the approximately four-hour weekly, round-trip drive she had been required by the family court to make to the facilities and locations where she and Kleinman would meet to exchange K.E.L.

---

[4] At trial, Kleinman and Lawson both associated the sum of $20,000 with an abortion of K.E.L., and $100,000 with custody of K.E.L. Lawson asserted Kleinman offered her $20,000 to abort K.E.L., or $100,000 to purchase the child. Whereas, Kleinman testified he offered to pay for Lawson's abortion, if that was her choice; but, that Lawson demanded he pay her $20,000 to have an abortion. Kleinman also testified he later offered Lawson $100,000 after K.E.L.'s birth to "settle" with her regarding her additional financial demands relative to K.E.L. In any event, it is undisputed no such agreements were ever made, and neither amount was ever paid.

[5] At trial and at length, the parties reviewed the evidence underpinning the several reports Lawson made to authorities alleging Kleinman's alleged abuse of K.E.L. None of Lawson's reports were substantiated; nor, for that matter, does Lawson discuss any of the evidence relative to her complaints in her brief before this Court.

-20-

under supervised conditions; and that the personnel staffing the exchange facilities were, in her view, biased against her.

In a June 10, 2020 order, the family court denied Lawson's motion, explaining in relevant part as follows:

> Respondent continues, through this motion, to ask the Court to accept the many falsehoods proposed by her that have riddled the evidence in both the extensive hearings accorded in 18-D-00428-001 and the many hours of testimony and the voluminous exhibits produced in this custody action.
>
> Respondent's Motion fails to recognize the Court's responsibility to judge the credibility of the witnesses. In each of the lengthy hearings involving the unfortunate relationship between Respondent Lawson (hereinafter Lawson) and Petitioner Kleinman (hereinafter Kleinman), it became abundantly clear that Lawson quickly recognized a lucrative massage client in Kleinman, who very foolishly sought a masseuse through Craigslist.
>
> This Court's determination of the truthfulness accorded to testimony given by witnesses in this hearing is crucial. [FN]
>
>> [FN] Lawson was pro se for a period in early 2019, following the withdrawal of Hon. Chris Wilkie and prior to the entry of Hon. Raven Turner. She drafted and entered pleadings with attachments, entered as Petitioner's Exhibits 27 and 28. Exhibit 28 is a 16-page single-spaced motion detailing her relationship with Kleinman that differs significantly from sworn testimony she offered during the hearing.

-21-

Based on the often-bizarre description given of the relationship by Lawson, and the overwhelming evidence of her obsession with the Kleinman Family, the Court finds scant evidence of Lawson's truth-telling ability throughout the entirety of this case.

This Court found that Kleinman made no demand of Lawson to terminate the pregnancy no[r] did he offer to "buy" the child from Lawson. The record of text messages and emails presented by both Lawson and Kleinman are replete with the sober and careful consideration Kleinman suggests regarding the choices available to them for the pregnancy.

The entry of the Domestic Violence Order (admittedly mistakenly stated as lasting three years rather than two years) provided to be an obstacle to the visitation exchanges and caused Lawson to test the DVO's limits on several occasions. Her excuses showed her contempt for the Court issuing it, and her constant complaining regarding the need for supervised exchange of the child three hours away from her home. Lawson failed to recognize that the need for a supervised location was a direct result of her actions that led to the issuance of the DVO.

The entry of the DVO is also the source of many of Lawson's alleged errors of the Court's Judgment in this case, as the DVO and events leading to its issuance figured heavily into the parties' actions revealed in the custody hearing. Because of the requirement of no contact between Lawson and any members of the Kleinman family, the visitation exchanges for the child were necessarily held at an exchange point requiring supervision and reporting. Lawson sought relief several times from the personnel at Parent's Place, stating that they were either partial to Kleinman or being paid off by Kleinman to report favorably of him.

Lawson's refusal to accept the basis for the entry of the DVO's terms led to further abrogation of the visitation exchanges. Her decision to require her minor children to participate in the exchanges by having them present the child to Kleinman is further evidence of the poor judgment Lawson displayed as the mother of adolescents.

Accounting for this Court's requirement to determine the credibility of witnesses and the way the DVO intertwined with the custody decision disposes of the majority of Lawson's alleged errors of the Court's Findings.

The overwhelming evidence of Lawson's obsession with the Kleinman family was of such force that it controls the balance of Respondent's allegations of error. Lawson's several attempts to harass Kleinman's family with reports to the Tennessee Department of Children's Services, as well as very disturbing requests to involve law enforcement through the Bristol Police department, showed Lawson's unhealthy obsession was heightening rather than lessening.

As indicated, Lawson raises the same points again in this appeal which, all told, take issue with how the family court weighed and drew inferences from the evidence. However, our standard of review is limited. As explained in *Glodo v. Evans*, 474 S.W.3d at 552-53,

Trial courts are vested with broad discretion in matters concerning custody and visitation. *Drury v. Drury*, 32 S.W.3d 521, 525 (Ky. App. 2000). Further, in the absence of an abuse of discretion, we will not disturb a trial court's decision. *Young v. Holmes*, 295 S.W.3d 144, 146 (Ky. App. 2009). "Abuse of discretion in relation to the exercise of judicial power implies arbitrary action or capricious disposition under the circumstances,

-23-

at least an unreasonable and unfair decision." *Sherfey v. Sherfey*, 74 S.W.3d 777, 783 (Ky. App. 2002) (internal quotation marks omitted). "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999) (citation omitted). The test is not whether we as an appellate court would have decided the matter differently, but whether the trial court's rulings were clearly erroneous or constituted an abuse of discretion. *Cherry v. Cherry*, 634 S.W.2d 423, 425 (Ky. 1982).

Addressing the appellate review of a trial court's findings of fact, the standard is well-established. Questions as to the weight and credibility of a witness are purely within the province of the court acting as fact-finder and due regard shall be given to the court's opportunity to judge the witness's credibility. Kentucky Rules of Civil Procedure (CR) 52.01; *Sherfey*, 74 S.W.3d at 782 (Ky. App. 2002) (*overruled on other grounds by Benet v. Commonwealth*, 253 S.W.3d 528 (Ky. 2008)). Therefore, factual determinations made by the circuit court will not be disturbed on appeal unless clearly erroneous. CR 52.01. Findings of fact are not clearly erroneous if supported by substantial evidence. *Sherfey, supra*.

Finally, we conduct a *de novo* review of the trial court's application of the law to the established facts to determine whether the ruling was correct as a matter of law. *Laterza v. Commonwealth*, 244 S.W.3d 754, 756 (Ky. App. 2008). "Under this standard, we afford no deference to the trial court's application of the law to the facts[.]" *Id*. (Citation omitted.)

As an aside, Lawson argues the family court failed to apply a

presumption, as set forth in KRS 403.270(2), that "joint custody and equally shared

parenting time is in the best interest of the child." However, an examination of that provision demonstrates that no such presumption applied under the circumstances. In relevant part, KRS 403.270(2) provides:

> The court shall determine custody in accordance with the best interests of the child and equal consideration shall be given to each parent and to any de facto custodian. *Subject to KRS 403.315*, there shall be a presumption, rebuttable by a preponderance of evidence, that joint custody and equally shared parenting time is in the best interest of the child. . . .

(Emphasis added.)

> In turn, KRS 403.315 provides:
>
> When determining or modifying a custody order pursuant to KRS 403.270, 403.280, 403.340, 403.740, the court shall consider the safety and well-being of the parties and of the children. *If a domestic violence order is being or has been entered against a party by another party* or on behalf of a child at issue *in the custody hearing*, *the presumption that joint custody and equally shared parenting time is in the best interest of the child shall not apply as to the party against whom the domestic violence order is being or has been entered*. The court shall weigh all factors set out in KRS 403.270 in determining the best interest of the child.

(Emphasis added.)

During a June 10, 2020 hearing, the family court extended Kleinman's DVO against Lawson for an additional two years, and that DVO is not a disputed subject of this appeal. Accordingly, by the plain language of KRS 403.315, the presumption indicated in KRS 403.270(2) did not apply here.

-25-

Lawson also asserts the family court erred in granting her four days per month of visitation because, in her view, the family court failed to make a predicate finding of "endangerment" to warrant interfering with her "equal right to timesharing" specified in KRS 403.270(2). As discussed above, however, equal timesharing is a presumption, not a right; and no such presumption applied here. Furthermore, Lawson did not preserve this argument below by contesting the family court's order granting her four days per month of visitation; nor, for that matter, can the family court's ruling be considered palpable error under the circumstances. A finding to the effect that visitation would "endanger seriously the child's physical, mental, moral, or emotional health" is required when a family court determines a parent is not entitled to reasonable visitation. *See* KRS 403.320(1). And, it cannot be said that four days per month of visitation – where the parents live several hours apart, one parent has sole custody, and even Lawson's evidence supported that extended car rides had a negative effect upon K.E.L. – is patently unreasonable. *See, e.g.*, *Hudson v. Cole*, 463 S.W.3d 346 (Ky. App. 2015) (determining a visitation schedule of one weekend per month with no overnights was reasonable where the parties lived several hours apart from one another, and long absences from the custodial parent would have a negative impact on the child).

We now turn to the merits of the family court's custody order. We have reviewed the extensive record in this matter. The family court's findings set forth in its order were consistent with and amply supported by the evidence; and, while it may not have been evidence favorable to Lawson, it was nevertheless substantial, and we are not at liberty to re-weigh it. CR 52.01. Likewise, the family court properly applied the law to its findings. In awarding Kleinman sole custody, the family court carefully weighed the "best interests" factors of KRS 403.270(2); and it focused particularly upon subsections (f) and (g)[6] in determining that, due to the DVO, what gave rise to it, and the necessity for keeping it in effect, Lawson and Kleinman could not effectively serve K.E.L.'s best interests as co-parents or joint custodians. Accordingly, we affirm this aspect of the family court's decision.

## II. ATTORNEY'S FEES

Lawson argues the family court erred in denying her request to have Kleinman pay an amount of the outstanding balance of her attorney's fees accrued in this matter. In support, she notes the family court was aware of the disparity

---

[6] The "best interests" factor of KRS 403.270(2)(f) focuses on "[t]he mental and physical health of all individuals involved;" whereas the focus of subsection (g) is upon whether there has been "[a] finding by the court that domestic violence and abuse, as defined in KRS 403.720, has been committed by one (1) of the parties against a child of the parties or against another party. The court shall determine the extent to which the domestic violence and abuse has affected the child and the child's relationship to each party, with due consideration given to efforts made by a party toward the completion of any domestic violence treatment, counseling, or program[.]"

between her income and Kleinman's substantially higher income; and she represents in her brief that "only a small portion of the intensive litigation can be laid at [her] feet, based on a limited number of intemperate actions, some of which not coincidentally occurred during the time she was a *pro se* litigant."

We review the family court's decision regarding attorney's fees in this context under the abuse of discretion standard. *Smith v. McGill*, 556 S.W.3d 552, 556 (Ky. 2018). In relevant part, KRS 403.220 provides:

> The court from time to time after considering the financial resources of both parties may order a party to pay a reasonable amount for the cost to the other party of maintaining or defending any proceeding under this chapter and for attorney's fees, including sums for legal services rendered and costs incurred prior to the commencement of the proceeding or after entry of judgment. . . .

To be sure, the parties' financial disparity is a viable factor for the circuit court to consider in applying the statute. *Smith*, 556 S.W.3d at 556. However, it is not the only factor; nor does the use of the word "may" in KRS 403.220 render an award of attorney's fees mandatory. Here, in its June 10, 2020 order resolving this issue, the family court noted the parties' disparity of incomes, but denied Lawson's request because the disparity was outweighed by other factors:

> Lawson's own actions have clearly caused the lengthiness of the proceedings and to reward her with attorney's fees at this time would likely provoke more.

-28-

Kleinman has previously paid $8,000 on Lawson's behalf to two of her previous attorneys. The work "unfortunately" is included in this ruling because it likely results in the hard work and many hours expended by the attorney who represented her very ably for the past 12 months to be unpaid for all her work. Lawson received the amount of $4,000 per month from Kleinman for the three months prior to the child's birth and he, too, has had to pay attorney's fees from the inception of the litigation in May 2018.

As the family court indicated, Kleinman had already paid Lawson's attorneys $8,000, and prior payments of attorney's fees are a consideration in determining whether to award more. Kleinman had already voluntarily paid Lawson the equivalent of $12,000 prior to K.E.L.'s birth, and that, too, was a valid consideration. *See, e.g.*, *Neidlinger v. Neidlinger*, 52 S.W.3d 513, 520 (Ky. 2001), *overruled on other grounds by Smith*, 556 S.W.3d 552 (explaining a court could have considered, as a reason for denying a request for attorney's fees, that the appellee's "payment of $3,600.00 per month in voluntary maintenance and support prior to and during the early stages of this action provided sufficient financial resources for Appellant to pay her own attorney's fee" (citation omitted)).

Moreover, the record supports that Lawson's conduct was a driving force in prolonging these proceedings. It occasioned a DVO which has remained in force for four years, along with several days of trial leading up to it – for which Lawson admittedly paid her defense counsel $5,000 of what the family court had ordered Kleinman to pay her for purposes of the custody action. As the family

-29-

court explained at length in its orders, its ultimate custody decision was intertwined with the DVO; what the family court deemed was Lawson's repeated testing of the DVO's parameters; and Lawson's credibility during both the DVO and custody proceedings which prompted extensive cross-examination due to what the family court also deemed were "the many falsehoods proposed by her that have riddled the evidence in both the extensive hearings accorded in 18-D-00428-001 and the many hours of testimony and the voluminous exhibits produced in this custody action."

Pursuant to KRS 403.220, family courts have great discretion in determining whether to award fees and, if so, in what amount. *Smith*, 556 S.W.3d at 556. This is because they are "'in the best position to observe conduct and tactics which waste the court's and attorneys' time and must be given wide latitude to sanction or discourage such conduct.'" *Id*. (quoting with approval *Gentry v. Gentry*, 798 S.W.2d 928, 938 (Ky. 1990)). With that in mind, we cannot say that the circuit court's assessment of the evidence underpinning its decision was indicative of clear error, or that its decision was otherwise an abuse of its discretion. Thus, we affirm.

### III. USE OF SOCIAL MEDIA

Months after the family court granted him sole custody, Kleinman filed a motion to modify its child custody determination to limit K.E.L.'s exposure

-30-

to social media. His motion was prompted by Lawson's posting of several images and videos on FaceBook and YouTube. These postings were readily discoverable through internet searches keyed to K.E.L.'s name, and included commentary and titles indicating that K.E.L. needed to be "rescued" and returned to his mother; and that K.E.L., who was no longer in her custody, was being "abused." A hearing was held on June 10, 2020, wherein the family court considered several of Lawson's offending posts; testimony from Kleinman; and testimony from Lawson, who reported that on occasion she had been recognized and approached by strangers in relation to this custody action (once while shopping for yogurt at a Tennessee grocery store). Kleinman argued that if Lawson's online activity had caused her to become recognizable to the public, K.E.L. could likewise be recognizable and in danger of being targeted by both good-intentioned and bad-intentioned actors.

On June 30, 2020, the family court entered an order granting Kleinman's motion, specifying in relevant part:

> Respondent is hereby Ordered to cease posting material online that contains the name and likeness of the parties' minor child on any publicly accessible social media platform. Respondent shall make "private," i.e. set to be accessible only to "friends," any material with commentary that tends to lead the viewers to believe that the child is in danger and cease from posting commentary of the sort in the future, even if the setting is private.

On appeal, Lawson does not address the evidence underpinning, or merits of, the family court's order. Instead, relying upon KRS 403.824(1)(b), she

argues the family court lacked jurisdiction to enter it.  In relevant part, KRS

403.824 provides:

> (1) Except as otherwise provided in KRS 403.828, a
> court of this state which has made a child custody
> determination consistent with KRS 403.822 or 403.826
> has exclusive, continuing jurisdiction over the
> determination until:
>
> > . . .
>
> > (b) *A court of this state or a court of another
> > state determines* that the child, the child's
> > parents, and any other person acting as a
> > parent do not presently reside in this state.

(Emphasis added.)

In support of her argument that KRS 403.824(1)(b) deprived the

family court of jurisdiction to resolve Kleinman's motion, she repeats the

substance of a "motion to transfer" that she electronically filed with the Fayette

Circuit Clerk at 4:33 p.m. on June 9, 2020 (*e.g.*, on the day before the June 10,

2020 hearing, after the clerk's office had closed).  There, in pertinent part, she

argued:

> Here, the parties are the parents of one (1) minor
> child, K.E.L. (age 2 years old).  In the Petitioner's,
> Michael [sic] Kleinman ("Michael" [sic]), recent motion
> to extend the Domestic Violence Order ("DVO"), he
> states that he and the minor child have moved to
> Tennessee.  In addition, Michael informs the Court that
> Rhonda has also moved to Tennessee.  Michael does not
> indicate that his move, or Rhonda's move, is temporary
> in nature and he does not express any intent to return to

-32-

Kentucky. Michael and the minor child have been residing in Tennessee since at least October of 2019, and Rhonda moved to Tennessee in February of 2020. Given that neither parent, nor the minor child, continue to reside in Kentucky, Kentucky has lost jurisdiction of this case. KRS § 403.824(1)(b). Also, on today's date Rhonda filed an action in Tennessee for this matter to be heard in Tennessee, case No. BCJ-17404. A copy of the Petition is attached hereto as "*Exhibit 1*." In addition, a hearing on Rhonda's Tennessee's petition is currently scheduled in Bristol for July 15, 2020 at 4:00 p.m.

Since all the parties reside in Tennessee, Kentucky has lost its exclusive, continuing jurisdiction over this case and must relinquish jurisdiction to Tennessee. This is not discretionary.

Michael has already informed the Court that neither parent, nor K.E.L., resides in Kentucky at this time. Thus, this Court is without subject matter jurisdiction to modify or otherwise address any child custody issues and must transfer this case to Tennessee.

As an aside, the family court and Kleinman took issue with several aspects of Lawson's "motion to transfer" at the onset of the June 10, 2020 hearing, including the motion's extremely recent filing, and the fact that it had not been noticed for a hearing. Furthermore, contrary to a "certificate of service" on the purported Tennessee petition representing that petition had been filed and personally served upon Kleinman on June 9, 2020, Lawson's counsel could not verify that any petition had indeed been filed in Tennessee, nor that Kleinman had indeed been served. Kleinman, for his part, testified that he had *not* been served.

Apart from that, the record itself bears no indication of whether – assuming Lawson had moved to Tennessee – her move was temporary or permanent.

In denying Lawson's motion through its written order of June 30, 2020, however, the family court made only the following statement: "Respondent's Motion to Transfer is OVERRULED."

Lawson now appeals, reasserting the same argument she made below regarding the family court's jurisdiction. But, we cannot address it. The necessity of a finding regarding Lawson's residence was clearly required by KRS 403.824(1)(b). It was, in the words of CR 52.04, "an issue essential to the judgment[.]" In full, CR 52.04 provides:

> A final judgment shall not be reversed or remanded because of the failure of the trial court to make a finding of fact on an issue essential to the judgment unless such failure is brought to the attention of the trial court by a written request for a finding on that issue or by a motion pursuant to Rule 52.02.

As indicated, the family court failed to make any finding regarding Lawson's residence. And, courts speak "only through written orders entered upon the official record." *Oakley v. Oakley*, 391 S.W.3d 377, 378 (Ky. App. 2012) (internal quotation marks and citation omitted). Thus, after the family court found in Kleinman's favor, Lawson was obligated to bring this failure "to the attention of the trial court[.]" CR 52.04. But, Lawson did no such thing. Accordingly, she has

deprived this Court of authority to assess the matter of her residence. As stated by

the Kentucky Supreme Court in *Eiland v. Ferrell*:

> If the findings are objectionable on grounds other than
> insufficiency of evidence, an objection or appropriate
> motion should be made to identify the defect. Such
> would surely apply where findings are ambiguous or
> incomplete. In particular, CR 52.04 requires a motion for
> additional findings of fact when the trial court has failed
> to make findings on essential issues. Failure to bring
> such an omission to the attention of the trial court by
> means of a written request will be fatal to an appeal.

937 S.W.2d 713, 716 (Ky. 1997) (citation omitted). Thus, "[t]he thread which runs

through CR 52 is that a trial court must render findings of fact based on the

evidence, but no claim will be heard on appeal unless the trial court has made or

been requested to make unambiguous findings on all essential issues." *Id*.

Stated otherwise, "[t]he appellate court reviews for errors, and a

nonruling cannot be erroneous when the issue has not been presented to the trial

court for decision." *Commonwealth v. Smith*, 542 S.W.3d 276, 285 (Ky. 2018)

(internal quotation marks and citation omitted). Absent any finding from the

circuit court on the essential issue of Lawson's residence, we have nothing to

review; and, absent any request from Lawson to the family court to make such a

finding, we cannot reverse the family court's decision on this point. *See* CR 52.04.

## CONCLUSION

We have addressed the balance of Lawson's appellate arguments.

Consistently with the foregoing, the Fayette Family Court is AFFIRMED.

ALL CONCUR.

BRIEFS FOR APPELLANT:

Louis P. Winner
Louisville, Kentucky

BRIEF FOR APPELLEE:

Anita M. Britton
Tamara Combs
Lexington, Kentucky